**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA )
 )
 )
 )  Crim. No. 20-18
v. )
 )
MELQUAN BARNETT )
 )
 )

**RESPONSE OF THE UNITED STATES OF AMERICA
TO DEFENDANT MELQUAN BARNETT'S
MOTION TO DISMISS THE INDICTMENT (DKT. NO.29)**

   AND NOW comes the United States of America, by Stephen R. Kaufman, Acting United States Attorney for the Western District of Pennsylvania, and Donovan Cocas, Assistant United States Attorney, and respectfully files this Response to the "Motion to Dismiss Charges on Grounds of Selective Prosecution" (Dkt. No. 29) that counsel for Defendant Melquan Barnett filed in this Court on February 1, 2021.  For the reasons set forth below, the Motion to Dismiss ("Motion" or "Mot.") should be denied.

### *FACTUAL AND PROCEDURAL BACKGROUND*

   In the wake of George Floyd's death during his arrest on May 25, 2020 in Minnesota, organizers in Erie, Pennsylvania scheduled a protest for the early evening of May 30, 2020.  See Exhs. A and B.[1]  Announced on Facebook, the protest was to begin at 6:00 p.m. and conclude

---

   [1] Citations to "Exh." shall refer to the lettered exhibits attached to this Response.  Those exhibits corresponding to DOJ press releases, state and federal court pleadings and docket sheets, and hearing transcripts are reproduced in full where cited.   The remaining exhibits refer to news and magazine articles.   To avoid copyright violations, those exhibits will consist of a single page bearing the exhibit letter and a URL where the cited document can be found.   Although the Court may take judicial notice of news articles, see United States v. Hedaithy, 392 F.3d 580 607-08 & n.24 (3d Cir. 2004), it need not do so because the issue before it is not whether the articles exist or

around 9 p.m., and the organizers urged protesters to remain peaceful and refrain from the "burning and destruction" that had marred similar protests across the country in the days prior.   See Exhs. N and T.   However, the president of the Erie chapter of the NAACP had never heard of these organizers and harbored concerns about the level of organization for a peaceful protest, so he declined to attend, fearing volatility.[2]   See Exhs. F and L.

Among those who heard of the planned protest was 28-year-old Barnett, an Erie resident who had ten prior involvements with law enforcement as an adult, including a conviction for giving false identification to police officers.   See Exh. B; see also Exhs. J and Z.   Though he had never attended a protest before, Barnett was eager to attend this one so that he could tell his kids that he had been "part of" the historic event.   See Exhs. B and Z.   Although Barnett later would claim that he wanted to join a peaceful protest, see Exh. Z, he was a no-show for the first three hours: even though the organizers had contemplated that the demonstration would be over by then.   See Exh. B.

Beginning at 6:00 p.m., hundreds of protesters gathered at Perry Square in downtown Erie. See Exh. K.   For the next three hours, the protest was peaceful, with demonstrators "linking arms and chanting at passing cars" and even practicing social distancing because of COVID-19.   Exhs.

---

contain reliable information, but whether the internet articles that *Barnett* cites in his motion suffced to make out a prima facie case of selective prosecution or to order discovery.   The Court should note that a video of Barnett's crime is embedded within Exhibit C, whose URL appears on the corresponding cover page.

[2] Barnett implies that Black Lives Matter ("BLM") organized the Erie protest on May 30, 2020, as did the national media.   See Mot. at 1; see also Exhs. B and Z.   That is inaccurate.   The Erie protest was organized by two local residents who claim no affiliation with BLM.   See Exhs. N and T.   Because BLM is a legal entity --- a corporation that does not qualify for nonprofit status because it backs political candidates, yet operates under the 26 U.S.C. §501(c)(3) tax-exemption umbrella of Thousand Currents --- this Response will simply refer to the Erie protest and the ensuing riot as "the protest" and "the riot," without attributing either to BLM.

B, L, and N.   Police officers were present, but only to support the protesters by directing traffic around them, since the organizers had not sought a permit.   See Exh. R.   For nearly all of that first three hours, protesters viewed the event as "beautiful" and "a community coming together." See Exh. Z; see also Exh. N.   Someone fired a paintball at a car at around 8:30 p.m., but other than that, the demonstration was placid.   See Exh. VV.

But by the time Barnett arrived at around 9:00 p.m., see Exh. B, the protest was over.   See Exh. S.   He, like others who would commit crimes and clash with police, waited for cover of darkness to join a crowd of 100 to 200 people gathered outside the police station.   See Exhs. B, Z, K, R, V, and VV.   That crowd was "largely different" than those who had attended the peaceful protest, and some of the newcomers were overheard asking for directions, thus confirming officers' suspicions that an out-of-town element had showed up after dark.   See Exhs. K, L, and R. Minutes later, more latecomers arrived in a car; several people broke away from the crowd, ran up to the vehicle, and were given large fireworks by those inside.   See Exhs. K and L.

At 9:12 p.m., the atmosphere changed when the new crowd attempted to force their way into the Erie Police Department and, frustrated in their efforts, began spray painting signs near the building and shattering windows.   See Exhs. K, Q, and R.   This moment marked the end of the peaceful protest, and the opening act of a wide-ranging riot that would rage across downtown Erie for the next three hours.   See Exh. K.   At that point, police warned the rioters that the event had become an unlawful assembly and advised them that they had 5 minutes to disperse peacefully. See Exhs. Q and R.   At 9:15 p.m., when the crowd had shown no intention of obeying that order, officers warned them that they still had 2 minutes to disperse.   See Exh. R.

When the rioters still had not moved, police released harmless colored smoke at least twice in the hopes of pushing them back.   Exhs. K and R.   But the crowd remained, so the SWAT team emerged from the basement of the building, where it had been on standby.   Exhs. Q and R.   These

officers wore standard protective riot gear which probably saved some of their lives that night, see Exhs. R, but Barnett viewed them as "all kitted up like they [*sic*] about to go to war."   Exh. B. However, these officers advanced slowly toward the crowd, asking them to disperse and never firing a shot.   Exh. R.   Yet the crowd stayed put.   Exh. K.

But as Barnett would later say, "[y]ou keep pushing somebody, eventually something's going to happen."   See Exh. B.   And happen it did: rioters began ripping parking meters out of the sidewalks and smashing them on the street; others threw bricks, rocks, frozen water bottles, glass milk bottles, and fireworks at police officers, shattering visors and cracking their shields. See Exhs. D, K, R, and W.   Meanwhile, in response to the officers' repeated orders to disperse, the crowd shouted back obscenities: a chorus joined by passengers in passing cars driven along State Street and North Park Row, who likewise cursed at and made obscene gestures toward the officers.   See Exh. K.

After hearing the fireworks booming like gunshots and sustaining burns when they detonated, see Exhs. K and L, officers realized that many of them were not of the usual consumer variety: some were "the huge fireworks that are shot off into the sky," which meant that they were essentially "mortar shells."   See Exhs. L and R.   As such, they "are like grenades --- if an individual is within close proximity of an explosion, a limb can be lost.   If it hits someone, it would kill them."   Exh. R.   So the officers remaining assembled on the roof of the adjacent City Hall building overlooking their besieged police station, released tear gas and, every few minutes thereafter, reiterated the warning to disperse.   See Exhs. K and R.

But when their warnings continued to go unheeded --- and the barrage from the rioters, unabated --- the Erie Police Department summoned "every available body" from its own force, including five officers who had stayed home as a precaution after exposure to a person with COVID-19 who had resisted arrest in the days prior.   See Exhs H and P.   Those officers answered

the call, wearing gas masks to protect the rioters in the event that they carried the virus.   See Exh.
P.   The Pennsylvania State Police and the Millcreek Police Department also responded.   See
Exhs. L, Q, and R.   Once reinforcements arrived, police slowly moved toward protesters en masse
every few minutes, reiterating the order to disperse.   Exhs. Q and R.   But for the next two hours,
a tense standoff persisted, with a core group of rioters refusing to leave and hurling objects and
obscenities at police.   See Exh. K.

At around 11:30 p.m., a smaller subset of the rioters --- perhaps 30 or 40, including Barnett
--- began running down State Street and into various side streets, stopping briefly in their flight to
shatter the windows and set fire to the businesses there with Molotov cocktails.   See Exhs. K, Q,
and R.   At that point, the law-enforcement objective became clearing everyone out of the area so
that officers could reach the handful of rioters who were setting fires to the buildings.   See Exhs.
L and R.   "[T]he reason there was so much concern about the destruction and fires set in some
downtown businesses is because some of the buildings have people who live in apartments above
the store fronts."   Exh. H.

As fires broke out, police officers and even civilians doused them with whatever was at
hand, extinguishing the blazes or preventing their spread.   Compare Exh. C (embedded video)
with Exhs. K and O.   But at about 11:50 p.m., the fire department was summoned to fight a fire
consuming the Erie Otters office.   Exh. K.   And at 11:55 p.m., the Mayor of Erie declared a state
of emergency and urged the city's residents to remain in their homes while police restored order.
Exh. K and O.   By midnight, however, most of the rioters had fled into the smoke, and the few
who remained were rounded up by 12:30 a.m. on May 31, 2020.   Exhs. K and S.

Live coverage of the Erie riot appeared on major television networks and images of the
destruction were shared over the internet.   Exh. C (embedded video); see also Exh. Z.   One Erie
resident who did not attend the protest was the owner of the Ember + Forge coffee shop on State

Street, who was at home when she saw video footage of someone setting fire to a table in her shop. Exh. Z.   The spectacle was "gut wrenching" for the owner because, as she watched the fire, she thought: "The building is going to go up!"   Exhs. B and Z.   This was especially alarming because "the building" that housed Ember + Forge contained ten occupied apartment units above it.   See Exh. H; see also Exh. J at 10.   But by the time the situation was under control at 12:30 a.m. on May 31, 2020, only seven arrests had been made; the remaining rioters had escaped.   See Exhs. L, SS, and UU.

Daybreak illuminated a downtown Erie resembling a "combat zone."   Exh. K.   The path of destruction began at City Hall and ravaged sixteen businesses over four blocks of State Street, many of which had emerged as part of Erie's efforts to revitalize its downtown area.   Exhs. K and Y.   The damaged businesses included the expERIEnce Children's Museum, McCoy's Barrelhouse, a Starbucks, Lucky's Convenience Store, a Subway eatery, Esther's Patina Shop, the offices of Modern Dental, the Gone Local Store, the Happy Garden restaurant, the Erie County Historical Society's offices, including the historical Cashier's House, the U Pick Six Tap House, the Erie Otters hockey team offices, and Ember + Forge: all of which bore graffiti, fires, broken windows, or some combination of the above as scars of the riot.   Exhs. F, R, Y, and UU.

Morning illuminated the human toll of the riot, too.   While no protesters reported injuries from their interactions with police, see Exh. R, surveillance footage showed one rioter pointing a loaded gun into the face of another before dropping the barrel to shoot him in the groin; meanwhile, a third man pulled up bricks from a landscaping display to throw at the wounded victim.   Exhs. L, U and SS.   Rioters also injured fourteen police officers, one seriously when he was hit with a firework mortar that broke his leg and put him out of work for an extended period.   See Exhs. D, W and TT.   Another officer suffered hearing damage, and still another sustained injuries to his face when a brick thrown by a protester broke his visor.   Exhs. L, TT.

The citizens of Erie demanded answers.   Exh. H.   One vocal taxpayer castigated the police and refused to acknowledge that a riot had occurred.   Exh. H.   Another fretted that white rioters' misconduct would be imputed to black rioters.   Exh. K.   But most denounced the violence and destruction, noting that it detracted from the message that the peaceful protesters had been trying to convey.   Exhs. K, L, R, and V.   Even some who had still been on the streets during the riots lamented the property damage, stating that the rioters should have "le[ft] the[] businesses alone."   Exh. V.

Detectives began the painstaking task of identifying the most dangerous rioters, including the arsonists who had melted into the night after torching businesses.   Exh. L.   But thanks to an initiative which funded the installation of new LED lighting and security cameras throughout downtown Erie in 2018, hundreds of hours of video footage of the riots existed.   See Exhs. L and R.   And because smartphones are ubiquitous, many of the rioters had recorded and posted videos of the event on Facebook.   See Exhs. R, V, and Z.   By culling this goldmine of evidence, police were able to either identify perpetrators themselves, or to post clear footage on the Erie Police Department's official homepage with a plea for help identifying suspects.   See Exhs. D and E.

Identifying the Ember + Forge arsonist was not difficult because of the quality and quantity of the video evidence.   See Exh. C (embedded video).   The suspect was a neck-tattooed man "with distinctive hair to the middle of his back wearing a white mask, white shirt, light blue jean jacket, black pants with a red and white striped pattern down the side and red shoes."   Exh. A.   Videos showed that, after a woman shattered the front window of the Ember + Forge, this man stopped, faced into the shop, tossed something inside, and then fled as a table caught fire.   See Exh. C (embedded video).   Moments later, another person, possibly a police officer, ran up to the flaming table and tossed something onto the fire in an apparent effort to douse it.   See Exh. C (embedded video); see also Exhs. K and O.

Although the videos did not show the arsonist's face, additional video footage taken that evening near City Hall showed the same man wearing identical clothing and shoes: and in that video, the man's unmasked face was fully visible.   Exh. A.   Authorities reviewing the video footage recognized Barnett --- who is not unknown to local police, see Exhs. J and Z --- as the man seen among the rioters outside City Hall and, later, torching the Ember + Forge.   See Exh. A. Accordingly, on June 1, 2020, the Erie Police Department announced that charges had been filed against seven people arrested during the riot, and against an eighth person who was still at large: Barnett.   See Exh. VV.   Two days later, Barnett was in custody and had retained counsel to answer several state charges, including two counts of arson, riot, and risking a catastrophe.   See Exhs. Z and SS.

On June 3, 2020, the United States filed a criminal complaint based on Barnett's actions during the riot and took him into federal custody.   Exh. A.   By that time, local authorities still had only identified and arrested seven other rioters, including a man named Tyvarh Nicholson who had been charged in state court with assault of a law enforcement officer, riot and possession of explosive/incendiary material after he attempted to light and throw a Molotov cocktail during the riot.   See Exhs. SS and VV.   Five additional rioters had been identified, but remained at large. See Exh. RR.

 At the initial detention hearing, counsel for Barnett implied that the worthiness of the cause behind the peaceful protest excused or justified the violent riot that followed; he also reminded the court that his community was "over" the police, minimized the seriousness of the arson, and characterized Barnett's prosecution as "political."   Exh. J at 5-7.   The United States pointed out that the evidence that Barnett had attempted to burn down the coffee shop during a riot was overwhelming; noted that his "ten prior involvements with the adult criminal justice systems" included a conviction for giving false identification to police; and added that his crime was

especially dangerous because it occurred during a riot, and because the building which housed Ember + Forge also had ten occupied apartments.   Exh. J at 8-13.

After noting the seriousness of the offense, specifically its strong "potential for injury or death to individuals," see Exh. J at 15, U.S. Magistrate Judge Richard A. Lanzillo ordered Barnett detained before trial.   See Dkt. No. 8.   The next day, a Grand Jury handed down a one-count Indictment accusing Barnett of malicious destruction of property by fire or explosives, a violation of 18 U.S.C. §844(i).   See Dkt. No. 10.   But after another hearing, this Court ordered Barnett to be released to the custody of his mother in August 2020, where he remains.   See Dkt.Nos.20-24.

Meanwhile, the Erie Police Department continued to track down other rioters.   Exhs. D and E.   Detectives were assisted by the fact that "[e]verybody knows everybody" in Erie.   Exh. F.   Within weeks, police had identified two dozen people who had been caught on camera committing crimes during the May 30, 2020 riot, and all had been charged with various criminal offenses.   Exhs. U and W.   By the end of August 2020, a total of 24 destructive or violent rioters had been arrested.   See Exh. TT.   But nine remained unidentified, so police posted photos of them on the department's official website and solicited the public's help.   Exh. E.   And in September 2020, a federal Grand Jury indicted Nicholson.   See Exh. M; see also Exh. VV.

In the fall of 2020, Barnett sat for interviews for national dissemination.   Exhs. B and Z. The journalists' selective accounts of the protest-turned-riot that had occurred months earlier in Erie bore scant resemblance to the contemporaneous local reports summarized *supra*, but they did quote several damaging admissions by Barnett.   See Exhs. B and Z.   And while Barnett's interviewers excused his criminal history and quoted some who opined that bringing federal charges against him was overkill, they ignored the less forgiving attitude of the *owner of the building* that housed Ember + Forge: who actually cleaned up the broken glass the morning after the riots, whose insurer actually paid for the damage, and who was "upset that someone would

light a fire in a business so close to the [ten] apartments" above it.   <u>Compare</u> Exh. L <u>with</u> Exhs. B and Z.

In February 2021, Barnett filed the instant Motion.

### *ARGUMENT*

Barnett moves to dismiss the Indictment, alleging selective prosecution.   <u>See</u> Mot.1-3. Primarily, Barnett argues that these federal charges would not have been brought but-for his participation in what he calls "First Amendment activities surrounding the death" of Floyd.   <u>See</u> Mot. at 3-6.   In addition, he asserts that this Office obtained the Indictment against him because of his race.   Mot. at 6-10.   In the alternative, Barnett insists that he is entitled to discovery "to establish why he was prosecuted federal[ly] and to adequately prepare for a trial."   Mot. at 10-11.

The Motion is frivolous.   *Violent rioting*, as opposed to *peaceful protest*, is not a First Amendment activity.   <u>See</u> <u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 886, 916 (1982). Regardless, Barnett cannot show that this Office only prosecutes rioters on his end of the political spectrum.   Nor can he establish that his race figured into this Office's decision to adopt his case for federal prosecution.   His prosecution advances multiple federal interests, and the comparators he identifies are dissimilar.   So he is not entitled to discovery, and the Motion should be denied.

### *ANALYSIS*

Without ever disputing that probable cause existed to charge him under 18 U.S.C. §844(i), Barnett essentially characterizes the specific people who decided to prosecute him federally, as well as the DOJ itself, as partisan racists.   <u>See</u> Mot. at 1-3.   But Barnett has *zero* evidence --- let alone clear evidence --- that either his race or his unspecified "First Amendment activities" had anything to do with this Office's decision to charge him in federal court.   Mot. at 3-6.   Barnett identifies no one similarly situated from the opposite end of the political spectrum who has not been charged federally, see <u>id.</u>, and while he insists that he would still be in state court had he been

Page **10** of **25**

white, the two white defendants he identifies are dissimilar to him.  Mot. at 6-10.  Falling far short of a prima facie showing of *any* impropriety, Barnett is not entitled to discovery.  See Mot. at 10-11.

"[T]he duty to prosecute persons who commit serious crimes is part and parcel of the government's paramount responsibility for the general safety and welfare of all its citizens."  In re Grand Jury Empaneling of Special Grand Jury, 171 F.3d 826, 832 (3d Cir. 1999).  "The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," so a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  United States v. Armstrong, 517 U.S. 456, 464 (1996) (internal citations and quotation marks omitted).

There are limits of course.   The DOJ may not select a person for prosecution "for reasons forbidden by the Constitution."   Armstrong, 517 U.S. at 463.   Of course, every federal prosecution contains an element of selectivity: because federal resources are limited, the DOJ is permitted to, and expected to, prioritize.   Oyler v. Boles, 368 U.S. 448, 456 (1962); see also Exh. AA, §9-27.230 cmt. 1 ("Justice Manual").   For that reason, and because of the presumption of regularity, the standard to prove that the DOJ has selected a given defendant for a constitutionally-improper reason is "demanding" and the defendant's burden, "high."   Armstrong, 517 U.S. at 463; see also United States v. Taylor, 686 F.3d 182, 197 (3d Cir. 2012).

"[A] criminal defendant must present clear evidence" to rebut the presumption that his prosecution does not violate equal protection.   Armstrong, 517 U.S. at 465.   He must show that "persons similarly situated have not been prosecuted *and* that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor."   Taylor, 686 F.3d at 197 (internal citations and quotation marks omitted; emphasis added).   A

defendant's viewpoint is one such "arbitrary factor."   See United States v. Torquato, 602 F.2d 564, 569-70 & nn.8-9 (3d Cir. 1979).   In other words, for a defendant to make out a claim of selective prosecution based upon his race or viewpoint, he must offer clear evidence that the DOJ relied on either of those factors in deciding to bring federal charges against him, *and* adduce clear evidence that similarly-situated defendants of different races or viewpoints were prosecuted in state court.   See United States v. Schmutzler, 602 F. App'x 871, 873 (3d Cir. 2015) (unpublished); see also Armstrong, 517 U.S. at 470.

Despite Barnett's contention that the DOJ "would not have prosecuted [him] but for his First Amendment activities," see Mot. at 3, he never actually specifies what his "First Amendment activities" supposedly were.   See Mot. at 3.   He cannot claim to be an activist, since he admitted that he had never attended another protest before and disavowed any association with known protest groups.   See Exhs. Z and QQ.   Barnett ultimately contends that his federal prosecution was to "silence [him] because of his participation in the May 30, 2020 demonstration."   See Mot. at 10.   To the extent Barnett means to imply that he participated in the peaceful protest that ran from 6:00 p.m. to 9:00 p.m. that evening, he is overlooking his own admissions during his media junket: when he claimed to have been "excited" about attending the protest, yet did not show up for it until around 9:00 p.m., when it was dark and the scheduled peaceful protest was over. Compare Exhs. B and Z with Exh. S.   Upon his arrival, Barnett joined what would in minutes become a *violent riot* outside City Hall and then, at some point thereafter, he committed at least one *federal felony offense* when he torched a table at Ember + Forge.   See Exh. A.   Surely Barnett, who has so far refused to admit that he set the fire despite clear video proof that he did, see Exh. J at 5, does not mean to suggest that *arson* is speech.

Such a suggestion would be frivolous.   Arson is not First Amendment activity, even if the arsonist has some subjective political agenda.   It is well-established that "criminal acts are not

protected speech even if speech is the means for their commission." Packingham v. North Carolina, --- U.S. ----, 137 S. Ct. 1730, 1737 (2017).   Of course, speech was not the "means" of Barnett's arson but, according to his counsel, the *end* of it.   Exh. J at 4.   Regardless, the First Amendment does not even give Barnett the right to *threaten* the health and safety of the public. If, as Justice Holmes famously wrote, "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic," see Schenck v. United States, 249 U.S. 47, 52 (1919), then it stands to reason that there can be no First Amendment right to *actually* set fire to that theatre without shouting anything.   Put another way, if a protester's mere verbal *threat* to incinerate another person's property falls beyond the pale of the First Amendment, and it does, see United States v. Fullmer, 584 F.3d 132, 157 (3d Cir. 2009), then so does a rioter's act of *actually torching the building*.   See Mahoney v. Doe, 642 F.3d 1112, 1122 (D.C. Cir. 2011) (Kavanaugh, J, concurring) ("One who burns down the factory of a company whose products he dislikes can expect his First Amendment defense to a consequent arson prosecution to be given short shrift by the courts.") (citation omitted).

But even if Barnett had engaged in protected First Amendment speech at some point that night, "the exercise of free speech can go beyond constitutionally protected boundaries to the realm of prohibited and criminal behavior."   Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 204 (3d Cir. 2008) (citation omitted).   Torching the Ember + Forge crossed that line. Barnett offers no "clear evidence" that First Amendment speech (if any) before or after his crime had anything to do with the decision to procure this Indictment.   Armstrong, 517 U.S. at 465. His only "evidence" of selectivity is a Wall Street Journal ("WSJ") article which he reads as proving that former U.S. Attorney General William Barr ("AG Barr") "told [federal prosecutors] to bring *this case* for political reasons, because the Trump administration disagreed with the point of view of the demo[n]strators."   Mot. at 3 (emphasis added).   Later, Barnett even claims that

AG Barr gave the "directive that federal prosecutors should aggressively punish conduct relating to the protected First Amendment activities that sprung from the death of George Floyd."   Mot. at 5.

But the WSJ article Barnett cites says nothing about "this case," and it does not say that AG Barr directed the DOJ to indict anyone "for political reasons": rather, it merely notes that the AG had verbally announced a DOJ policy of charging *violent* protesters.   Mot. at 3.   Moreover, Barnett ignores the written memo the DOJ disseminated on September 17, 2020 --- just a few hours *after* the WSJ published its article --- which emphasized that federal intervention would be limited to "violent rioting" regardless of its political impetus, not peaceful protest.   See Exh. BB. Consistently, the still-later DOJ press release that Barnett reads as "bragging" about federal charges filed in the wake of the 2020 riots, reiterated that the federal targets were *destructive* rioters whose acts showed "minimal regard to their communities and for the safety of others and themselves."   Mot. at 3-4.

The aftermath of the Capitol riot of January 6, 2021 dispelled any doubts about how evenhandedly the DOJ would apply its policy of charging violent rioters aggressively.   To date, the DOJ has filed federal criminal charges against more than 400 of the Capitol rioters.   See Exhs. G, I and X.   That total from that *one riot* on *one day* in *one city* exceeds the 300 or so people indicted federally in the wake of *all* of the several hundred Floyd riots that occurred throughout *all* of 2020 across *all* of the United States.   See Mot. at 4; see also Exh. LL.   And the number of Capitol rioters charged federally is increasing steadily as "the most complex investigation ever prosecuted" by the DOJ continues apace.   See Exh. G.   *This Office* has worked on the investigation, searches, arrests, and detention of the Capitol rioters who hail from the Western District of Pennsylvania, and 11 such people have been charged to date.   The Capitol riot had nothing to do with the death of George Floyd.   Accordingly, Barnett has utterly failed to offer *any*

evidence --- much less "clear evidence," see <u>Armstrong</u>, 517 U.S. at 465 --- to overcome the presumption that this Office's decision to bring federal charges against him was totally unrelated to his viewpoint.

The lion's share of Barnett's argument that his prosecution is politically-motivated flows from his contention that this Office indicted him "contrary to the normal standards for prosecution, as set forth in the [DOJ's] Justice Manual." Mot. at 4. But DOJ guidelines and policies, *including the Justice Manual*, create no enforceable rights for criminal defendants, see <u>United States v. Wilson</u>, 413 F.3d 382, 389 (3d Cir. 2005); <u>accord</u> <u>United States v. Christie</u>, 624 F.3d 558, 573 (3d Cir. 2010), so Barnett's reason for this analytical detour is unclear. Barnett's point may be that, if his federal Indictment serves "no substantial federal interest," and if he "is subject to effective prosecution" in Pennsylvania, see Mot. at 4, then any deviation from the Justice Manual, while not actionable in its own right, would constitute circumstantial evidence that his viewpoint spurred the DOJ to take the reins of his prosecution. Mot. at 4-6. Regardless, the Justice Manual does not support Barnett's claim that this Office misapplied it.

Barnett's contention that his crime implicates no substantial federal interest is frivolous. <u>See</u> Mot. at 5. George Floyd's death in Minnesota sparked protests in all 50 states and the District of Columbia, attracting between 15 million and 26 million people in the United States alone. <u>See</u> Exh. HH. When several hundred of the protests degenerated into riots, nearly 100,000 military personnel --- most of them U.S. National Guard units as well as 82nd Airborne and 3rd Infantry Regiments with the U.S. Army --- were activated nationwide by early June of 2020. <u>See</u> Exhs. HH and LL. But not even the largest peacetime military deployment in U.S. history could prevent the arson, vandalism, and looting which caused between $1 and $2 billion in insured damages nationally *by early June*, a total which represented the most damage ever reported from a U.S. civil disorder. <u>See</u> Exh. HH. Indeed, it is difficult to imagine a *more* compelling federal interest than

deterring violent individuals from wreaking widespread destruction while hiding behind others' peaceful First Amendment expression.[3]

The only other part of the Justice Manual that Barnett believes cuts against his federal prosecution is the section which advises the DOJ to consider whether "the person is subject to effective prosecution in another jurisdiction."   Mot. at 5.   Indeed, Pennsylvania could prosecute this crime effectively, but Barnett is wrong to imply that this consideration is dispositive.   Id.   As the Justice Manual recognizes, there are "many instances [in which] it may be possible to prosecute criminal conduct in more than one jurisdiction."   Exh. AA, §9-27.240.   And sure enough, many serious crimes pending on federal dockets could be prosecuted in state courts.   "Under [Barnett's] logic, the federal government could never prosecute child pornography offenses, drug offenses, weapon offenses, or any other offenses in which the majority of prosecutions are done by states, without the prosecution being vulnerable to attack on selective prosecution grounds.   Such an argument is patently untenable."   See United States v. Schmutzler, No. 13-65, 2015 WL 1912608, at *3 n.4 (M.D. Pa. Apr. 27, 2015).   Regardless, deterring future violence during an ongoing event of national and international significance is a sound justification for prosecution

---

[3] In contending that the only federal interest in his case is to "punish conduct relating to the protected First Amendment activities that sprung from the death of George Floyd," see Mot. at 5, Barnett ignores most of the Justice Manual section that he cites.   It states that, beyond law enforcement priorities, a "substantial federal interest" turns on a number of other factors, including the nature and seriousness of the offense, the deterrent effect of prosecution, the person's culpability vis-à-vis the offense, his criminal history, and the probable sentence or other consequences if he is convicted.   Exh. AA, §9-27.230.   Setting fire to a building containing occupied dwellings at night during a riot is unjustifiable, potentially deadly, and serious.   Exh. J.   Video evidence shows that the only culpable person is Barnett.   Exhs. A and C (embedded video).   Barnett's own comments to the media suggest that this prosecution will have a deterrent effect.   See Exh. Z.   Barnett has a criminal history.   Exhs. B, J, and Z.   The sentence that Barnett will receive if convicted should send the clear message that those who interfere with the legitimate First Amendment activity of peaceful protesters with violent, destructive behavior will be punished accordingly.   Exh. A.

Regardless, even the Justice Manual recognizes that those considerations "are illustrative only," and that others may be relevant in a given case.   Exh. AA, §9-27.240.   One uniquely-relevant consideration is that the DOJ is charged with protecting the First Amendment rights of its citizens against other citizens who would interfere with their exercise through acts of violence masquerading as speech.   See, e.g., United States v. Gregg, 226 F.3d 253, 259 (3d Cir. 2000) (upholding DOJ's enforcement of statute barring abortion protesters from blocking access to a reproductive health care facility).   That happened here: instead of peacefully protesting Floyd's death, as hundreds of others in Erie did that evening, Barnett used the occasion to settle a personal score with what he called a "racist little town" and the police tasked with protecting it.   See Exhs. B, J, L, N, R, and Z.   Barnett's violence stole the thunder of the legitimate message that peaceful protesters were attempting to convey, all so that he could slake his "deep well of anger" and boast to his children about his role in making history.   See Exhs. B, K, L, R, V, and Z.   The DOJ has every right to target those who hijack others' First Amendment speech with criminal violence. Exh. A.

If the foregoing were not more than enough to defeat Barnett's contention that his Indictment is politically-motivated, and it is, logic supplies its coup de grâce.   Had this Office targeted Floyd protesters in this District because of their political views, then one would expect it to prosecute *more than two* of the 400 people at the peaceful protest in Erie before 9:00 p.m. that evening, see Exh. K, *more than two* of the 100 rioters who ravaged the city thereafter, see Exh. L, or *more than two* of the 24 people charged in state court.   Yet it did not.   See Exhs. A and M. Indeed, state prosecutors made a conscious decision *not* to charge several people who "participated in activity downtown during the riot but without any overt criminal violence," see Exh. D, and this Office never considered charging them.   Conversely, the fact that this Office brought federal charges against only ten people --- out of the 3,000 people involved in the May 30, 2020 peaceful

Pittsburgh protest of George Floyd's death, the 200 who remained after that protest became a riot, or the 40 or so who actually engaged in violent or destructive acts there, see Exhs. GG, JJ, and KK --- also defeats Barnett's claim that it is singling-out Floyd protesters for prosecution.

Seemingly aware of the Achilles heel of his argument, Barnett accuses this Office of selecting him for federal prosecution for a second improper reason: because of his race.   Mot. at 6-10.   But as was true of his theory that his prosecution was politically-motivated, Barnett offers no evidence, clear or otherwise, to show that this Office indicted *him* because of his race.   See Mot. at 1-10.   That shortcoming is, again, fatal, because he must show *both* a discriminatory purpose *and* a discriminatory effect.   See Taylor, 686 F.3d at 197; see also Armstrong, 517 U.S. at 465; Wayte v. United States, 470 U.S. 598, 608-09 (1985).   Instead, Barnett focuses solely on the effect of this Office's decision to charge him and Nicholson in the wake of the Erie riot, arguing that two supposedly similarly-situated white people only faced state charges.   Mot. at 6-7.   But neither of the two comparators Barnett offers are similarly situated to him.

Comparators will not be similarly situated unless they are "alike in all relevant respects." Harvard v. Cesnalis, 973 F.3d 190, 205 (3d Cir. 2020) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).   Nor will they be similarly situated if their crimes implicated different interests in the Justice Manual.   See, e.g. Armstrong, 517 U.S. at 465 (listing factors that mirror several in the Justice Manual, see Exh. AA, §9-27.230); see also United States v. Smith, 231 F.3d 800, 810 (8th Cir. 2000) (noting that Armstrong's list "informed" the inquiry into whether comparators are similarly situated for selective-prosecution purposes).   Those who committed substantially different crimes or engaged in substantially different conduct are not similar, either.   See Taylor, 686 F.3d at 197.   The DOJ's reasonable assessment that one defendant's crime posed a greater risk of injury to the public than another defendant's, even if they participated in the *same crime* at the *same time*, makes them dissimilar.   See, e.g., Crane v. Cumberland County, Pa, 64 F. App'x

838, 840 (3d Cir. 2003) (unpublished) (rejecting selective-prosecution claim brought by a black male who was the only person charged for his role in a fistfight with two white men, where the black male wielded a knife during the fight whereas the white men were unarmed).   Substantial differences in two people's criminal histories make their situations dissimilar, too.   Taylor, 686 F.3d at 197; see also United States v. Rhines, 143 F. App'x 478, 481 & n.3 (3d Cir. 2005) (unpublished).

The more superficially-similar of the two comparators Barnett identifies is Jacob M. Miller, a man accused of igniting pillows in a Marshalls store in an Erie suburb last summer.   Mot. at 9; see also Exh. PP.   Miller faces *seventeen* state felony charges from that act.   Exh. EE.   But despite Barnett's implication that the DOJ knew of Miller's case but "showed no interest" in it, see Mot. at 9, he has not shown that the DOJ had ever heard of Miller's alleged crime before now. Certainly, this Office had *not*.[4]   That matters.   Oyler, 368 U.S. at 456; see also Armstrong, 517 U.S. at 470 (noting the relevance of "whether similarly situated persons of other races were prosecuted by the [state] *and were known to federal law enforcement officers*, but were not prosecuted in federal court.") (emphasis added).   Regardless, Miller apparently acted alone in setting a fire in a standalone store structure in broad daylight.   Barnett acted with other rioters[5] by setting a fire in a building containing ten apartments in the middle of the night.   See Exh. C (embedded video); see also Exhs. H, J, and L.   The fact that Barnett committed his crime *during*

---

[4] Nor, for that matter, had the rest of the world, whereas Barnett was part of the nationwide violent rioting that drew scorn from allies and enemies alike.   See Exhs. MM, NN, and OO.

[5] Although Barnett has denied that he was influenced by "any outside group" such as ANTIFA, see Exh. QQ, the United States here assumes that he did work with other rioters after he joined the angry mob outside City Hall, at least by accepting Molotov cocktails or other incendiary devices from someone.   Police saw coordination of that nature occurring generally at around 9:00 p.m., around the time that Barnett arrived.   See Exhs. K and L.   Had Barnett truly worked alone, then he must have brought incendiary devices with him.   In that scenario, he made up his mind to set fires in downtown Erie before even heading out that evening.

*a full-scale riot* (whereas Miller did not) is decisive: not only because of the national implications of the riot, but because the rioters' refusal to disperse delayed authorities in their efforts to reach structures that other rioters were torching in rapid succession.   See Exhs. L and R.   So Barnett's actions "posed a greater risk of injury to the public" than Miller's.   Crane, 64 F. App'x at 840. Finally, there is the matter of prior criminal records: Miller apparently has none, whereas Barnett has an extensive one.   Exh. J.   That makes the two men dissimilar, too.   Rhines, 143 F. App'x at 481.

The other comparator Barnett identifies, a fellow Erie rioter named Yesenia Vicenty, see Mot. at 6-7, is not similarly situated to him, either.   To be sure, Vicenty's act of breaking a window of the Ember + Forge riot implicated federal interests inasmuch she did so during the same riot, just before Barnett paused to set fire inside the building.   See Exh. C (embedded video); see also Exh. CC.   But breaking a window is simply not the same crime as setting fire to a building: even if the former facilitated the latter and especially where, as here, it is unclear whether the vandal conspired with the arsonist or otherwise knew of his intentions.   See Taylor, 686 F.3d at 197. And Vicenty already has pleaded guilty to her crimes in state court and received a sentence of 9 to 18 months in prison.   Exh. DD.   The fact that Barnett is exposed to tougher sanctions than Vicenty's crimes triggered in state court is irrelevant in the selective-prosecution analysis.   The DOJ is *permitted* to select defendants for prosecution based on the penalties available in federal court.   United States v. Batchelder, 442 U.S. 114, 125 (1979).   Nor is this unfair to Barnett.   He *should* face more time than Vicenty: breaking one window posed some risk of injury to passersby, whereas torching the coffeeshop risked killing every person in the ten apartments in the building as well as any firefighters who could have been called to extinguish the blaze, not to mention the possibility that the fire could spread to adjacent buildings.   Epstein v. S.E.C., 416 F. App'x 142, 149 (3d Cir. 2010) (unpublished) ("[D]issimilar facts result[ing] in dissimilar sanctions" have no

tendency to show selective prosecution).   This is a valid consideration.   <u>Crane</u>, 64 F. App'x at 840.   And like Miller, Vicenty apparently had no prior criminal record, whereas (once again) Barnett did: yet another important distinction.   <u>Rhines</u>, 143 F. App'x at 481.[6]

The bottom line is that Barnett has not carried his heavy burden of establishing, with "clear evidence," that this Office selected his crime for federal prosecution based on his unspecified "First Amendment activity" or his race.   See <u>Armstrong</u>, 517 U.S. at 463-65; <u>see also</u> <u>Taylor</u>, 686 F.3d at 197.   Barnett names no one of a different political persuasion who was similarly-situated to him, yet avoided federal prosecution.   See Mot. 1-6.   And while Barnett tries to identify two white comparators whose cases remained in state court, see Mot. at 6-10, neither Miller nor Vicenty are similar to him.[7]   Because Barnett has not even made out a prima facie case, the DOJ

---

[6] Barnett briefly contrasts the state prosecutions of two Erie arsonists with the federal prosecution of a third local arsonist named Crawford, apparently in aid of his point that it is unusual for arson to lead to federal charges.   Mot. at 7-9.   This begs the question.   Barnett never relates these cases to *his* by identifying the race or political persuasion of any of those defendants.   <u>See</u> <u>id.</u>   Instead, he argues that the two arsonists tried in state court could have been prosecuted federally because the interstate-commerce element was met.   Mot. at 7-8.   But as the Justice Manual indicates, that is not reason enough to prosecute anyone.   <u>See</u> Exh. AA, §9-27.230 ("Federal law enforcement resources are not sufficient to permit prosecution of every alleged offense over which federal jurisdiction exists.").   And touting the Crawford case as setting a threshold of seriousness before an arson warrants federal prosecution backfires on Barnett.   For while *both* put first responders at risk by setting fire to other people's buildings, see Mot. at 9, Crawford's crime only affected a standalone, unoccupied business, whereas Barnett *also* risked the lives of any apartment-dwellers asleep in the building *and* encouraged others across the country to take similar risks with other people's lives under the guise of "protest."

[7] Also, of the eleven Capitol rioters from the Western District of Pennsylvania who this Office has assisted in identifying and charging, *all* are white.   And of the ten people who have been charged federally in the Western District of Pennsylvania for their respective roles in ravaging downtown Pittsburgh after the May 30, 2020 protest of Floyd's death there was officially declared a riot, *four* are white.   (The names of the defendants in each investigation are all matters of public record, so Barnett may verify their races through those sources.)

has no burden to show that its decision to prosecute him federally was justified.   See United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir. 1989).   So he is not entitled to dismissal of the Indictment.

Finally, Barnett argues that, even if he has not demonstrated selective prosecution, he is entitled to discovery so he can gin up such a claim.   Mot. at 10-11.   He is wrong.   "[C]riminal defendants seeking discovery on an anticipated selective prosecution claim" must first show "some evidence" of discriminatory effect and discriminatory intent, including a credible "showing that similarly situated persons were not prosecuted."   See United States v. Washington, 869 F.3d 193, 214-16 (3d Cir. 2017).   While slightly lighter than the "clear evidence" prerequisite for a prima facie case, the "some evidence" burden remains "correspondingly rigorous" and "should itself be a significant barrier to the litigation of insubstantial claims," because discovery imposes "many of the costs present when the Government must respond to a prima facie case of selective prosecution."   See Armstrong, 517 U.S. at 464-68.   Before Washington, "neither the Supreme Court nor [the Third Circuit] ha[d] ever found sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices."   See Washington, 869 F.3d at 215.   And even *after* Washington, the Third Circuit remanded for potential discovery on a selective *enforcement* claim, which uses a lighter standard.   Id. at 219-21.

Here, as explained *supra*, Barnett has adduced *no* evidence of discriminatory effect and discriminatory intent.   Washington, 869 F.3d at 214-16.   No evidence is less than "some evidence."   The substance of his Motion consists of five news articles and a few cases involving prosecutions of garden-variety arsonists who did not cloak their acts in legitimate First Amendment activities of others while police and first responders were already stretched to the limit during nationwide civil unrest.   Mot. at 1-10.   These are not even "some" evidence warranting discovery.   Hedaithy, 392 F. 3d at 607-08 & n.24 (finding that defendant's reliance on eight newspaper articles failed to establish his right to discovery on selective-prosecution claim).

Barnett's insinuation that a nefarious motive can be drawn from the fact that, according to his counsel's experience, this Office "rush[ed]" to prosecute him, see Mot. at 10, is illogical: indicting a defendant *before all of the suspects are even known*, as occurred here, see Exhs. A, SS, and VV, implies less selectivity, not more.   Regardless, defense counsel's "statements of personal experience" cannot even support a claim of selective prosecution, let alone justify discovery. United States v. Hayes, 236 F.3d 891, 896 (7th Cir. 2001).

Ultimately, a defendant alleging selective prosecution must offer more than speculation, and more than "personal conclusions based on anecdotal evidence," to obtain discovery. Armstrong, 517 U.S. at 470.   But Barnett has no more.   Mot. at 10-11.   Barnett also should be mindful of the possibility that he could be prosecuted on *both* federal *and* state charges, particularly if he is right about the strength of Pennsylvania's interest in his case.   See Gamble v. United States, --- U.S. ----, 139 S. Ct. 1960, 1964 (2019) (holding that, just as a state may prosecute a violation of state law even if the defendant already stands convicted of a violation of federal law for the same act, the federal government may prosecute a federal-law violation even if the defendant stands convicted for the same conduct under state law); see also United States v. Sampo, No.17-143, 2020 WL 7634161, at *5 (D. Alaska, Dec. 22, 2020) (citing Gamble in rejecting a defendant's contention that his prosecution in federal court was selective).   Regardless, his request for discovery must be denied.

### *CONCLUSION*

Barnett's contention that he was indicted federally because of his "First Amendment activity" is frivolous.   The First Amendment entitles Americans to protest peacefully.   It entitles no one to riot or set fires to other people's property, even if the match is struck to make a point. That principle transcends politics.   As one presidential nominee said when the George Floyd riots raged across the country last summer, "[r]ioting is not protesting," and "setting fires is not

protesting."   See Exh. II.   Barnett's bare suspicion that his race influenced this Office's decision to bring federal charges follows the write-up of an interview he gave in which, after *Barnett* described *Erie* as racist, the author noted in passing that two black men were under federal indictment for the crimes they committed there during the riot.   See Exh. Z.

In the end, Barnett purposefully engaged in destructive, life-threatening conduct that splashed him all over network and internet news sites.   Exh. B and Z; see also Exh. C (embedded video).   He deliberately inserted himself into, and contributed to, the very mayhem that caused billions of dollars in damages and prompted world leaders to express a range of sentiments, from alarm to schadenfreude.   See Exhs. B, Z, HH, LL, MM, NN, and OO.   And he went out of his way to do interviews within days of his release to house arrest to explain *why* he did what he did, without actually admitting that he did it.   See Exhs. B and Z.   In the face of all of this, Barnett cannot seriously deny that prosecuting him in this Court serves the federal interest in deterring would-be rioters from mistaking violence and destruction with legitimate speech: particularly at a time of civil unrest so widespread and intransigent that the international community stops in its tracks to take notice.   The two white comparators who Barnett names are insufficiently similar to him, even if he had evidence of discriminatory intent: which he does not.   That a few others of unknown races or political views were or were not prosecuted for arson federally is irrelevant.   To even *ask* for discovery based on this inadequate showing is to "engage[] in the type of fishing expedition rejected by" Armstrong.   See Hayes, 236 F.3d at 896.

## **PRAYER**

WHEREFORE, and for all of the foregoing reasons, the United States asks this Court to deny the Motion (Dkt. No. 29) with prejudice, without ordering discovery.

Respectfully submitted,

STEPHEN R. KAUFMAN
Acting United States Attorney

/s/Donovan Cocas
DONOVAN COCAS
Assistant United States Attorney

Dated: April 3, 2021